PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

DEREK ELLIOTT TICE,

        *Petitioner-Appellee,*

v.

GENE M. JOHNSON, Director of
Virginia Department of
Corrections,

        *Respondent-Appellant.*

No. 09-8245

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
Richard L. Williams, Senior District Judge.
(3:08-cv-00069-RLW)

Argued: September 21, 2010

Decided: April 20, 2011

Before NIEMEYER and KING, Circuit Judges, and
Robert J. CONRAD, Jr., Chief United States District Judge
for the Western District of North Carolina,
sitting by designation.

---

Affirmed by published opinion. Judge King wrote the opinion, in which Judge Niemeyer and Judge Conrad joined.

---

**ARGUED:** Stephen R. McCullough, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Vir-

ginia, for Appellant. Christopher Todd Handman, HOGAN LOVELLS US LLP, Washington, D.C., for Appellee. **ON BRIEF:** Kenneth T. Cuccinelli II, Attorney General of Virginia, E. Duncan Getchell, Jr., State Solicitor General, Virginia B. Theisen, Senior Assistant Attorney General, Charles E. James, Jr., Chief Deputy Attorney General, Steven T. Buck, Deputy Attorney General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellant. Melissa N. Henke, GEORGETOWN UNIVERSITY LAW CENTER, Washington, D.C.; E. Desmond Hogan, Thomas J. Widor, Liana G.T. Wolf, HOGAN & HARTSON, LLP, Washington, D.C., for Appellee.

---

## OPINION

KING, Circuit Judge:

William Bosko, stationed aboard the frigate *USS Simpson* following Navy basic training, debarked to the pier in Norfolk, Virginia, during the afternoon of July 8, 1997, having spent the week at sea. Bosko hoped to reunite at the pier with his bride of three months, Michelle. When Michelle failed to show up, Bosko supposed that his wife had started her new job and was unable to meet him as arranged, so he took a taxicab to the apartment they shared.

Bosko called out to Michelle as he entered the apartment, but he received no response. He looked for a note but found none. Bosko decided to shower, change clothes, and surprise Michelle at work. As he strode into the bedroom, Bosko discovered his lifeless wife on the floor, clad only in a black T-shirt and lying in her own blood. Someone had strangled Michelle while using a steak knife to stab her several times in the chest. The police found the bloody knife under a chest of drawers, the serrated blade bent at nearly a right angle to its handle.

Two weeks earlier, another woman living nearby had been severely beaten. Ten days after Michelle's murder and scarcely more than a mile away, a 14-year-old girl was raped. On March 22, 2000, Omar Ballard, who was by then serving a long prison sentence for both of those crimes, pleaded guilty to the rape and murder of Michelle Bosko. In return for Ballard's guilty pleas, prosecutors agreed to forgo any attempt to have him put to death. Ballard had confessed to the Bosko murder not long after being confronted with a letter he wrote a female acquaintance from prison:

> And one last thing you Remember that night i went to Mommie's house and the Next morning Michelle got killed guess who did that, *Me* HA, HA. It wasn't the first time . . . . if i was out i would have killed that Bitch down the street from you too.

Upon being forwarded the letter, the police had a forensic lab compare DNA extracted from Ballard's blood to that derived from biological samples taken from Michelle's vagina and beneath her fingernails, and from a blanket used to cover her. In each and every instance, the DNA found at the crime scene was highly correlative to that of Ballard. For his despicable acts against Michelle Bosko, Omar Ballard was sentenced to serve the rest of his life in prison.

I.

This appeal, though inextricably entwined with the Bosko murder, has almost nothing to do with Omar Ballard. It is instead an appeal by the Director of the Virginia Department of Corrections (the "Director") of the district court's grant of a writ of habeas corpus to the appellee, Derek Elliot Tice, who has twice been convicted in the Circuit Court for the City of Norfolk of raping and murdering Michelle Bosko. The first time was on February 14, 2000, following a jury trial conducted by Judge Charles E. Poston. That conviction, however, was overturned by the Court of Appeals of Virginia, which

concluded that Tice's jury had been improperly instructed. *See Tice v. Commonwealth*, 563 S.E.2d 412 (Va. Ct. App. 2002).

On January 31, 2003, on retrial before Judge Poston, a different jury found Tice guilty of rape and murder, for which he was sentenced to concurrent terms of life imprisonment. At this second trial, the Commonwealth built its case on two evidentiary pillars. The first was the eyewitness testimony of Joseph Dick, who, in 1999, had himself pleaded guilty to Michelle's rape and murder. Dick lived with Danial and Nicole Williams, in an apartment catercornered to that where the Boskos resided. According to Dick, on the evening before Michelle's body was discovered, he was at his apartment with Danial Williams, Eric Wilson, and four other men whom Dick hardly knew: Geoffrey Farris, Rick Pauley, John Danser, and Tice. After listening to Williams speak provocatively about Michelle, the seven men became excited and knocked on her door, but she would not let them enter. The group dispersed to the parking lot, where they encountered Ballard, whom Michelle had met and trusted. Ballard knocked on Michelle's door, and when she opened it, everyone rushed in. Dick testified that all of the men raped Michelle and then took turns stabbing her.

The second pillar was Tice's own signed confession, given to Detective Robert G. Ford of the Norfolk Police Department, on June 25, 1998:

> Q. Tell me in your own words what you know in reference to this offense.
>
> A. Okay. On the night in question Rick Pauley and myself went over to Daniel [sic] Williams' apartment planning on going to a bar called the Ban[que]. When we got there Daniel's [sic] wife, Nicole, was feeling ill, so we decided to stay there and talk. Nicole went to bed.

The guys, which was Daniel [sic] Williams, Eric Wilson, Joseph Dick, Jeffrey Farris, Rick Pauley, and myself, were there talking, and we got onto the subject of females. We talked about which ones we'd like to have, if we could. Daniel [sic] Williams talked about Michelle and wanting her above all other females.

* * *

We then sat down and decided what all was going to be done. I made the statement that if we did this that we shouldn't leave her alive.

* * *

We went over. It was either Eric or Dan with their thumb over the peep hole of her door. Myself, I believe it was Dan and Jeff, also knocked on the door. Because she could not see through the peep hole she asked who it was. Dan made the statement that it was himself and some friends, and that we had come over to talk. She said that she didn't want to talk and to leave her alone. I made the statement that all we wanted to do was to come in and talk. She refused.

At that time Daniel [sic] Williams left, came back with a claw hammer. Him and Jeff clawed at the door. The rest of us pushed our way inside. Dan was the first one inside, grabbed her around the back of the head and around the mouth so she couldn't scream.

When the rest of us got inside, we disrobed her, held her down. . . . Dan was the first to have intercourse with her, I was the second, Eric was third. It was Jeff, Joe, and then Rick.

After that a couple of us had forgotten about the killing of Michelle as planned. She started to get up. Jeff and Joe, as well as Dan, proceeded to bring her on up to standing. Dan started to strangle her, keep her from talking and to kill her. I made the statement that she could just pass out and she could still live. I also made the statement to just get a knife and stab her.

Jeff went, grabbed the knife from the kitchen —

Q. Do you remember your exact words at that point?

A. Just go ahead and stab the bitch, I believe is what I said.

When Jeff came back, he stabbed her. Cupped her mouth with his hand so she could not scream, then Dan stabbed her, I stabbed her, then Eric stabbed her, Joe stabbed her, and Rick Pauley also stabbed her.

\* \* \*

Q. Did Michelle Bosko fight the entire time?

A. Yes, sir, she did put up a struggle the whole time.

Q. Was she pleading with you all to leave her alone?

A. We could not tell, because the whole time she was kept from saying anything by hands being put over her mouth, but I could see in her eyes that she was pleading for help.

* * *

Q.   You were the second to rape her; is that correct?

A.   Yes, sir.

Q.   Did you ejaculate?

A.   Yes, sir.

* * *

Q.   And before the six of you went to this house you had decided that you were going to rape and kill Michelle Bosko; is that correct?

A.   Yes, sir.

J.A. 600-08.[1] Tice's graphic and poignant account of what occurred in Michelle's apartment could not fail to resonate with any jury, but his recitation contains three incontrovertible errors or omissions of fact. First, there was no evidence of forced entry into the premises, whether from marks made by a claw hammer or otherwise. Second, although Tice said that he ejaculated, the only DNA evidence found at the crime scene was linked to Omar Ballard; Tice and his alleged confederates were all flatly ruled out as donors of the tested samples. Third, Ballard undeniably raped Michelle, but one will search in vain to find Ballard's name or any reference to him anywhere in Tice's confession.

In his questions to Detective Ford concerning Tice's confession and again during closing argument, defense counsel James Broccoletti aimed skillful jabs at his client's affirmative misstatements. But it was during his cross-examination of

---

[1]Citations herein to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties to this appeal.

Joseph Dick that Mr. Broccoletti landed several haymakers. Dick had concluded his testimony on direct examination by averring that no one had promised him anything in exchange for his testimony, but counsel effectively impeached that assertion by confronting Dick with his plea agreement. The agreement permitted Dick to plead guilty to first-degree murder and thereby avoid trial on the initial charge of capital murder; in return, Dick was required to "cooperate fully in the ongoing investigation into the murder of Michelle Moore Bosko, and to testify truthfully against any codefendants if needed." J.A. 218.

Mr. Broccoletti then embarked on a lengthy review of Dick's evolving story, starting with his statements to the police on January 12, 1998. During his first several hours in custody, Dick denied any involvement, but he eventually told the detectives that he accompanied Williams to the apartment and that he watched while Williams raped Michelle. About an hour later, after Detective Ford predicted aloud that the DNA evidence would prove that Dick was more directly involved, the latter conformed his account to say that the confrontation had begun as a consensual encounter, that he had also penetrated Michelle and ejaculated in her mouth, and that he had snatched the knife from Michelle and stabbed her after she had tried to attack Williams. Dick recounted that the stabbing had begun in the living room, but that he could not recall whether it had ended there or somewhere else in the apartment.

About three months later, on April 27, 1998, the police again interrogated Dick upon the lab's confirmation that his DNA was not found at the crime scene. This time, Dick named Wilson as an additional culprit and said that Williams alone stabbed Michelle. Then, on June 16, 1998, after no match had been found to Wilson's DNA, Dick told the police that six people had joined together to attack Michelle, including one named "George Clark," whom Dick later identified as Tice. At that time, Dick maintained that the group had put

Michelle's body in a blanket, but he admitted to Mr. Broccoletti on cross-examination that he had not been truthful as to that detail. Dick also acknowledged the various fabrications in his earlier stories, and he confirmed that he had lied under oath at Tice's preliminary hearing by withholding testimony placing Omar Ballard at the apartment.

Finally, Mr. Broccoletti questioned Dick concerning a letter Dick had written in 2000 or 2001, responding to an inquiry from Paul Dowling, a television producer:

> Q.   Did you say I want to make it very clear, and you underlined "make it very clear" to you that I did not participate in the rape and murder of Michelle Moore Bosko?
>
> A.   Yes, I did.
>
> Q.   "When I gave my statement, I was very confused and pressured by the police to admit to the rape."
>
> A.   That's right.
>
> Q.   "I told police what they wanted to know, so I could get them off my back."
>
> A.   Yes.
>
> Q.   "I told the police that everyone raped Ms. Bosko, when, in fact, they did not rape her."
>
> A.   That's correct.
>
> Q.   "I told the police everything they wanted to hear."
>
> A.   (NO RESPONSE)

Q.  Sir?

A.  Yes.

Q.  "I told the police that everyone stabbed Ms. Bosko, when, in fact, that did not happen, either."

A.  Yes.

* * *

Q.  And in that letter you told Mr. Dowling that two people had committed the murder, correct?

A.  Yes.

Q.  And Mr. Dowling wrote back to you and asked you who those two people were?

A.  Yes.

Q.  And you wrote back to Mr. Dowling shortly thereafter, correct?

A.  Yes.

* * *

Q.  In that letter to Mr. Dowling you said I will tell you the names of the two defendants. The names of the two defendants are Richard Pauley and Jeffrey [sic] Farris.

A.  Yes.

* * *

Q.  Is it true there were only two?

A. No.

Q. As recently as Sunday night, Mr. Dick, you said you weren't there, didn't you?

A. That's true.

Q. Two days ago.

J.A. 254-59. Pauley and Farris, as well as Danser, were charged with the rape and murder of Michelle Bosko, but they were never prosecuted and the charges were eventually dropped. None of them ever confessed to the crimes. Williams, Dick, Wilson, and Tice, by contrast, each gave Detective Ford signed confessions, and this group, which became known as the "Norfolk Four," suffered the opposite fate: Williams and Dick each pleaded guilty in 1999 to murder and rape; that same year, Wilson was tried and convicted of rape but found not guilty of murder; and Tice, as noted, was twice convicted by a jury of both charges.

The investigatory process that culminated in 2000 with Ballard's conviction was characterized by grim repetition. The police first targeted Williams, who, after spending the night at the police station being interrogated, confessed to raping and killing Michelle by himself. About five months later, after the forensics lab ruled out Williams as the donor of the crime scene DNA, the police obtained their first confession from Dick, who later implicated Wilson once it was determined that no physical evidence linked Dick to the crimes. Only after Wilson was likewise eliminated as a donor did Detective Ford extract the information from Dick that led to Tice's arrest. And although Tice at one point augmented his identification of Pauley, Farris, and Danser by telling the police that an unknown, muscular black male 5′9″ to 5′10″ had also been involved, Omar Ballard, who fit that general description, was never a suspect until he wrote the letter from jail incriminating himself.

   Ballard was called to testify at Tice's second trial and asked point blank whether he had raped Michelle. Even though the court reassured Ballard that his testimony could not lead to further punishment, he repeatedly refused to answer that question or any other. Faced with Ballard's continued intransigence, the court held him in contempt and returned him to custody. Detective David M. Peterson nonetheless read the jury a pair of Ballard's statements wherein he freely admitted that he alone took Michelle's life. Ballard was more reticent in acknowledging the rape, but eventually did so after initially maintaining that Michelle had consented to intercourse:

> Q.   [by Detective Ford] Have you ever had sex with Michelle Bosko before?
>
> A.   Yes, one time.
>
> Q.   Where at?
>
> A.   In her apartment.
>
> Q.   And, who was in the apartment then?
>
> A.   Just me and her.
>
> Q.   [by Detective Peterson] How long before this offense did you have sex with her?
>
> A.   About a month.
>
> Q.   [by Detective Ford] Is there anything you wish to add to this statement?
>
> A.   No, just them four people that opened their mouths is stupid.

J.A. 472. The remainder of Tice's defense concerned itself primarily with establishing that the crime scene DNA was

associated with Ballard and no one else, and that the police investigation had inaccurately focused upon other suspects, specifically Pauley and Danser.

During closing argument, counsel for the Commonwealth adverted to Joseph Dick's testimony on at least two occasions (comprising about four to five pages of the transcript), urging the jury to accept it as true notwithstanding the inconsistencies in his myriad recitations. Counsel indicated to the jurors that, in order for them to believe the defense's theory that Omar Ballard acted alone, "you'd have to discount [Dick's] testimony entirely." Transcript of Trial, Jan. 29, 2003, at 170. The prosecution spent rather more time and energy emphasizing Tice's confession:

> What it comes down to in this case, ladies and gentlemen, is the confession given by the Defendant. Ladies and gentlemen, people confess because they are guilty. They want to get something off their chest. That's as simple as that, that's a perfectly reasonable explanation why somebody confesses.
>
> * * *
>
> People just do not confess, particularly, to something of this magnitude, this heinous, this vicious, without having participated in it. It's just not natural, it's just not reasonable. People just don't do this, ladies and gentlemen.
>
> * * *
>
> [F]or somebody to confess to a crime that the defense alleged in their opening that he didn't commit is just not reasonable. . . . No, ladies and gentlemen, he confessed because he thought he did it, because he knew he had done it. That's why he told them that he did it. . . . [Y]ou have no reason put

before you from this trial that this man was going to confess to this, other than the fact that he did it . . . he gave his statement.

* * *

[L]adies and gentlemen, if you don't believe that Omar Ballard did this by himself, then you have to believe that the Defendant was there, and his confession tells you that he was there. There's no other reasonable conclusion to reach in this case, you can't disregard his confession.

*Id.* at 172-80. The closing arguments began after lunch, and, after they concluded, the jury was instructed and then retired to deliberate for the rest of the afternoon, the entire next day, and for a short while the day after that. At 3:25 p.m. on the second day, the jurors sent a note to Judge Poston:

THE COURT:   Come on up here. Okay. The Jury has sent this question: Is the signed confession of Derek Tice direct or circumstantial evidence, or considered some other kind of evidence. This is in reference to instruction 12.

And the answer to that is [] both circumstantial evidence and direct evidence are competent methods of proof. You should assign such weight to the evidence, whether circumstantial or direct, as you deem appropriate.

Transcript of Trial, Jan. 30, 2003, at 3. Upon receiving the court's answer, the jury deliberated for about another two and one-half hours before declaring its verdict that Tice was guilty of rape and murder. A three-judge panel of the Court of Appeals of Virginia affirmed Tice's convictions on December 23, 2003, and, on July 6, 2004, the Supreme Court of Virginia entered an order declining to hear his appeal.

## II.

### A.

On September 14, 2005, Tice filed a petition in the trial court for a writ of habeas corpus pursuant to Virginia law. The matter was assigned to Judge Everett A. Martin, Jr., who considered the petition's various claims that: (1) the Commonwealth had frustrated due process by, among other things, improperly influencing Ballard to remain silent; (2) Judge Poston had erroneously excluded evidence favorable to the defense that bore on the probative value of the confession; and (3) Tice had been ineffectively assisted by counsel at both the trial and appellate stages. By Order entered April 4, 2006, Judge Martin rejected several of Tice's asserted bases for relief, particularly those relating to the trial court's evidentiary rulings, leaving the remainder of the claims to be adjudicated following a two-day hearing, beginning on September 11, 2006.

The first witness at the hearing was Omar Ballard, and counsel got right to the point:

> Q.  Mr. Ballard, you're currently serving two life sentences for the rape and murder of Michelle Moore-Bosko, correct?
>
> A.  Yes.
>
> Q.  Mr. Ballard, did you, in fact, murder Ms. Moore-Bosko?
>
> A.  Yes.
>
> Q.  Where did you murder her?
>
> A.  In an apartment at Bayshore Gardens in Norfolk, Virginia.

Q.   Mr. Ballard, was anyone else involved in the crime against Moore-Bosko?

[COUNSEL FOR COMMONWEALTH OBJECTS AND IS OVERRULED]

Q.   Let me ask the question again. Was anyone with you the night that you killed Ms. Moore-Bosko?

A.   No.

Q.   Mr. Ballard, was Danial Williams involved in this crime?

A.   No.

Q.   Was Joseph Dick involved in this crime?

A.   No.

Q.   Was Eric Wilson involved in this crime?

A.   No.

Q.   Was Derek Tice involved in this crime?

A.   No.

J.A. 843-44. Ballard recalled meeting with the Norfolk detectives on March 7, 1999, and again on March 14, 1999, testifying that he told the police on both occasions that he had acted alone. Ballard maintained that he was constrained to change his story, however, when it came time to negotiate his plea agreement:

Q.   Before you actually pled guilty, did you meet with the detectives to discuss your plea?

A.   Yes.

Q.   Who did you meet with?

A.   Detective[] Ford and Detective Peterson.

* * *

Q.   Mr. Ballard, tell me what happened when you were brought to the Norfolk Police Operations Center on that day, starting from the beginning.

A.   All right. Well, I was brought into a little interrogation room where I was informed that in order for me to get a plea agreement or have it accepted, I will have to tell the truth. That's supposed to have been a condition of my plea agreement.

So Detective Ford at the time asked me what the truth was. So I told him the truth was what I was saying all along, that I did it all alone. Nobody else was with me. And then he laughed and told me I'd never be able to receive my plea agreement if I keep on lying.

After which he ran a story down to me about me supposedly meeting the other defendants in the parking lot at a party at the complex that Michelle lived at asking for a cigarette. And then I supposed to have led them to her apartment where we supposedly took turns raping and killing.

Q.   What do you mean by ran down the story. "He ran down the story?" What do you mean by that?

A.   He basically told me a version of the story that I never heard of before.

* * *

Q. What happened after he told you this story?

A. Well, he left the room for about two or three minutes. Came back. Asked me was I ready to tell the truth. So I told him, yeah. So he asked me what the truth was. I told him the same thing before like I been saying the whole time, that I did it myself. Then he said, "Well, I guess you don't want your plea agreement."

So I felt at the time the only way I could escape the death penalty was to reiterate what he was telling me, which was me meeting the guys at the parking lot.

Q. And did you do that?

A. Yes.

Q. Was that statement true?

A. No.

*Id.* at 849-51.

The plea negotiations of which Ballard spoke took place about five weeks after he was called to testify at Tice's first trial. There, Ballard steadfastly denied having anything to do with the Bosko crimes. Confronted with the pair of inconsistent statements he made in March 1999, Ballard told the jury that he had lied to the police but did so because he was not then under oath. Ballard's willing (though false) testimony at the first trial stood in stark contrast to his adamant refusal to testify at the second; he attributed his silence in part to a prison visit from Detective Ford:

Q. So now that we have the scene, why don't you tell me what happened during this visit of Detective Ford and the other detective.

A. Well, Ford, as I entered the room, you know, we made small talk. He asked me how I was doing. He told me I was going to be called as a witness in Derek Tice's trial. So he then asked me how I was going to testify.

Q. He did ask you how you were going to testify?

A. Yes. Before I can express myself, articulate the way I was going to testify, he said, "Well, we know that the people that's incarcerated for this crime are the ones that are indeed guilty, and we don't want you to go up there and say nothing that will have anybody guilty being released from prison. So if you have nothing to say, just tell them you have nothing to say." And that's basically the extent of the visit.

*Id.* at 854-55.[2]

The parties devoted much of the hearing to exploring the circumstances of Tice's confession. After initially waiving his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), Tice was interrogated by Detective Ford and his associate, Detective Brian Wray, for about an hour. Tice then agreed to undergo a polygraph examination, which was administered by Detective Randy Crank. At the conclusion of the three-hour

---

[2]On October 27, 2010, Detective Ford was found guilty by a federal jury of two counts of extortion and a single count of lying to the FBI, stemming in part from his acceptance of tens of thousands of dollars from accused criminals in return for leniency in bail terms and in sentencing. *See* Tim McGlone, *Former Norfolk detective convicted of extortion*, Pilot-Online.com (October 28, 2010), http://dev.hamptonroads.com/2010/10/former-norfolk-detective-guilty-2-extortion-charges.

examination, Tice spoke further with Detective Crank, who took written notes of the exchange:

> I asked him who knocked on the door, said he didn't remember. He asked me if he could have some time to think about it, if he decide[d] to tell me could he talk to me and Wray, that he did [not] care for the other guy. He told me he decide[d] not to say any more, that he might decide to after he talks with a lawyer, or spends some time alone thinking about it. I told him he would be given time to think about it. He *did not* request a lawyer.

J.A. 614 (emphasis in original). Detective Ford testified that, until a couple of weeks prior to the habeas hearing, he had neither seen Detective Crank's notes nor been apprised of the conversation memorialized therein. Ford resumed his questioning of Tice thirteen minutes after Crank had finished, without reciting fresh *Miranda* warnings. Within half an hour of the resumption, Tice admitted to having taken part in the crimes against Michelle. Four hours later, the detectives had Tice's signed confession.

Judge Martin also heard testimony from Mr. Broccoletti concerning the latter's representation of Tice:

> Q. What was your defense to the charges at Derek's first trial?
>
> A. The defense was that the confession was false. In addition to that, that Mr. Dick was not a credible witness because of his plea agreement, because of his inconsistent statements, because of his demeanor and attitude on the witness stand.
>
> The defense was that Mr. Ballard, through both the physical evidence and the scientific evidence, was the sole perpetrator, that the physical evidence

that was recovered at the scene pointed exclusively to one individual and one individual only, and that would be Mr. Ballard.

\* \* \*

Q. And the theory of your defense at the second trial was the same as it was at the first trial?

A. Correct.

\* \* \*

Q. Did you consider filing a motion to suppress [the confession] based on Miranda grounds?

A. No.

Q. Did you ever discuss with Derek whether he had invoked his Miranda rights?

A. Yes.

\* \* \*

Q. This is a fax cover sheet . . . and on the second page, police notes. Do you recognize these notes?

A. I recognize them now, yes.

Q. When is the first time you saw these notes?

A. I can't tell you that. I don't know.

Q. Do you recall seeing these notes while you were representing Derek Tice?

A. I have real questions about whether I recalled seeing these notes until you showed me this morning

my yellow sheet of paper, which had my assistant's handwriting on it. So obviously I had the notes because it came — it must have come from my file because that's her handwriting. I recognize that.

\* \* \*

Q.   [W]ere these notes in your file while you were representing Derek Tice?

A.   They must have been. So if they were there, I'm sure that I reviewed them and I'm sure I saw it, but I can't tell you today when I saw it or specifically at what point in these matters.

*Id.* at 904-09. Jeffrey R. Russell, who had been co-counsel with Mr. Broccoletti throughout both trials, testified that he did not recall having seen the notes until shown them in advance of the habeas hearing. Russell volunteered, however, that any discussion of filing a motion to suppress would have been inspired by "the coercion and voluntariness issues that were a concern with Detective Ford," and not any *Miranda* grounds relating to the invocation of Tice's rights to remain silent or to representation by an attorney. *Id.* at 950.

By his letter opinion dated November 27, 2006, Judge Martin ruled that Ballard had decided on his own not to testify and that Tice's counsel had not been constitutionally ineffective with respect to several trial decisions that ultimately made no difference. *See Strickland v. Washington*, 466 U.S. 668, 691 (1984) ("An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." (citation omitted)). With especial regard to the confession, Judge Martin concluded that a motion to suppress on the grounds of involuntariness or of invocation of the right to counsel would probably have failed on the facts, with the result that Tice suf-

fered no prejudice by his counsel's allegedly deficient performance in failing to so move.

Judge Martin devoted the lion's share of his opinion, however, to discussing the petition's claim that Tice's counsel had been ineffective by failing to move to suppress the confession on the additional ground that Tice had invoked his right to answer no further questions. Judge Martin evaluated Tice's statement that "he decide[d] not to say any more" in the context of the applicable law:

> When a defendant has received a *Miranda* warning and waived his right to remain silent, as the petitioner did, the waiver will be presumed to continue throughout the interrogation until the defendant "manifests in some way which would be apparent to a reasonable person his desire to revoke it." . . . In *dictum* [in *Midkiff v. Commonwealth*, 250 Va. 262, 268 (1995)] the Court held the statement "I do not want to answer any more questions" would suffice. I have found five cases in which the Supreme Court of Virginia has ruled on the invocation of the right to silence. In three of those cases, in which the Supreme Court held the statements were equivocal, the statements were significantly different from the petitioner's. In *Burket v. Commonwealth*, 248 Va. 596, 610 (1994), the Court held the statements "I just don't think I should say anything because" and "I need somebody that I can talk to" were equivocal. In *Weeks v. Commonwealth*, 248 Va. 460, 470 (1994), the Court without discussion held "[d]o not want to discuss case any further" invoked the right to the silence. The statement here falls between those in *Burket* and *Weeks*, but it is closer to *Weeks*.

> * * *

> I find the first part of petitioner's statement (when put in the first person) "I've decided not to say any

more" was unambiguous and unequivocal. The second part of the statement "I might decide to say more after I talk to a lawyer or spend some time alone thinking about it" did not render the entire statement ambiguous or equivocal. It merely indicated he might be willing to speak at a later time.

The subsequent interrogation of the petitioner after he invoked his right to silence was not "scrupulously honored" under *Michigan v. Mosley*, 423 U.S. 96 (1975) and *Weeks*, *supra*. . . . Based upon the evidence, I believe a motion to suppress the petitioner's confession would probably have been granted on this ground.

*Tice v. Johnson*, No. CL05-2067, slip op. at 5-7 (Va. Cir. Ct. Nov. 27, 2006) (the "Circuit Court Habeas Opinion") (citations omitted).[3] Judge Martin acknowledged that Mr. Broccoletti and Mr. Russell "are highly respected and most capable," *id.* at 7, but nonetheless determined that, as to this single aspect of the trial, their performance was deficient within the meaning of *Strickland*. And, according to Judge Martin, counsel's lapse might well have made a critical difference in the jury room:

The evidence against the petitioner at his second trial was his confession, co-defendant Dick's testimony, and the physical evidence (which both corroborated and contradicted petitioner's confession). There was no fingerprint, DNA, or other scientific evidence against him; no independent eyewitnesses implicated him; no physical evidence directly implicated him.

False confessions do occur, but most people believe (and rightly so) that a person does not usually confess his involvement in a murder unless he

---

[3]The Circuit Court Habeas Opinion is found at J.A. 1072-81.

is guilty. There is probably no stronger evidence against a criminal defendant in the eyes of a jury than his confession. . . . Reading only a transcript I cannot say how effective a witness Dick was, but Mr. Broccoletti's cross-examination of him seems quite damaging. I find there is a reasonable probability the jury would have acquitted the petitioner if his confession had not been admitted into evidence.

*Id.* at 8-9. By Final Order entered December 20, 2006, Judge Martin delivered the circuit court's judgment "that counsel were ineffective and that the petitioner was prejudiced by his counsel's deficient performance, satisfying both the performance and prejudice prongs of *Strickland*, and thus the Court GRANTS the petition for a writ of habeas corpus on that portion of [the claim]." *Tice v. Johnson*, No. CL05-2067, Final Order at 2 (Va. Cir. Ct. Dec. 20, 2006).

## B.

On appeal by the Director, the Supreme Court of Virginia left intact Judge Martin's rulings that Tice had unambiguously invoked his constitutional right to stop answering questions, and that Tice's confession obtained thereafter would have been suppressed from trial had such a motion been made. The court also assumed that Tice's lawyers had performed in an objectively unreasonable fashion by failing to so move. Nevertheless, the court unanimously reversed Judge Martin's grant of the writ because, in its view, Tice had not shown sufficient prejudice to establish that the jury's verdict would have been different had counsel not erred. The court's conclusion rested substantially on its assessment of the strength of Dick's testimony:

[W]e note that Dick admitted at trial that he had not told the truth to the police regarding several details of the crimes. Those details included the room in which the crimes occurred, the question whether

Michelle performed oral sodomy on Tice and Williams, and the issue whether Michelle had gained control of the knife and threatened Williams. However, despite these and other inaccuracies in his earlier statements to the police, Dick was consistent in his sworn testimony implicating himself and Tice in the rapes and murder of Michelle, and did not change or retract any aspect of that testimony on cross-examination by Tice's trial counsel.

We also observe that Tice's counsel failed to present any evidence showing that Dick had a motive to fabricate his testimony concerning Tice's role in the crimes. When Dick gave his testimony at Tice's trial, Dick was serving two sentences of life imprisonment for his crimes against Michelle and was not subject to any additional penalties for those crimes. . . . Th[e] evidence established that Dick and Tice did not have a prior relationship that could support a charge that Dick disliked Tice or was otherwise biased against him. Thus, this evidence additionally supported the credibility of Dick's testimony about Tice's participation in the crimes.

Tice's defense at trial was based on the theory that Ballard alone committed the offenses against Michelle. Tamika Taylor's testimony undermined this theory. Her testimony revealed that Williams had an apparent obsession with Michelle, providing a link to the crimes perpetrated by the group that included Williams, Tice, and Dick. . . . Taylor's testimony also established that Ballard and Michelle were friends, and that Ballard frequently visited Michelle in her apartment. This testimony helped explain Ballard's statement to Detective Peterson that Michelle opened her apartment door to the group that included Ballard, when she earlier had refused entry to the original group.

In addition to the above testimony, the jury also received evidence concerning DNA samples recovered from Michelle's body and from a blanket found on the bed at the crime scene. Forensic scientists Robert Scanlon and Jerry Sellers both testified that intercourse can occur during a rape without DNA material being deposited in a victim's vagina, provided that the perpetrator did not ejaculate. Scanlon further explained a perpetrator would not usually leave epithelial cells containing DNA as a result of sexual intercourse. . . . This expert testimony, therefore, provided an explanation with regard to how several men could have raped Michelle with only one man, Ballard, having deposited bodily fluids from which DNA samples could be extracted.

We also observe that Tice presented evidence showing that John Danser and Richard Pauley, who were part of the group that Dick implicated in committing these crimes, had produced alibi evidence concerning their activities on the night Michelle was murdered. This evidence, however, did not relate to Tice's activities on the date of the offense and, therefore, was of questionable relevance to the issue whether Tice participated in committing the crimes against Michelle.

With these considerations in mind, and having reviewed all the evidence presented at Tice's criminal trial with the exception of his confession, we conclude that the circuit court erred in holding that Tice satisfied his evidentiary burden under *Strickland*. We hold, as a matter of law, that Tice failed to meet his burden of proving the prejudice prong of *Strickland*, namely, that there was a reasonable probability of a different result at his criminal trial if the jury had not considered his confession. In short, the

record before us does not undermine confidence in the outcome of the proceedings.

*Johnson v. Tice*, 654 S.E.2d 917, 924-25 (Va. 2008). In conjunction with its reversal of the lower court's judgment on Tice's primary claim, the Supreme Court of Virginia affirmed Judge Martin's rulings denying relief on two other claims preserved on cross-appeal, and it dismissed the petition in its entirety.

## C.

Having exhausted his postconviction remedies under Virginia law, Tice filed an application for federal habeas corpus relief pursuant to 28 U.S.C. § 2254(a) in the Eastern District of Virginia on January 28, 2008. The district court dismissed the two claims that Virginia's highest court had resolved similarly on cross-appeal, but granted the writ on the same ground identified by Judge Martin, namely, that Broccoletti's and Russell's failure to move to exclude Tice's confession as having been obtained in contravention of his right to remain silent constituted ineffective assistance of counsel. *See Tice v. Johnson*, No. 3:08-cv-00069, slip op. at 12-17, 40-41 (E.D. Va. Sept. 14, 2009) (the "District Court Opinion").[4] On the question of whether the confession would have been excluded from trial had the potential *Miranda* violation been brought to Judge Poston's attention, the district court agreed with Judge Martin's analysis, observing that "the Circuit Court's prediction . . . is persuasive . . . . [T]he Court finds that, had counsel filed a motion to suppress Tice's confession based on the failure to honor Tice's invocation of this right to remain silent, the motion would have been granted." *Id.* at 19-20 (citations omitted).

The district court also concurred with Judge Martin's evaluation of *Strickland*'s performance prong, opining that "any

---

[4]The District Court Opinion is found at J.A. 1124-64.

reasonable investigation . . . would have involved reviewing Detective Crank's notes of his conversations with Tice." District Court Opinion 27 (citations omitted). The court ascertained that counsel either overlooked the notes entirely, or at least did not fully appreciate their significance, and therefore the defense was "deficient for failing to file a motion to suppress Tice's confession." *Id.* at 28. With respect to the prejudice prong of *Strickland*, the district court concluded, in disagreement with the Supreme Court of Virginia, that "Tice's . . . confession provided compelling evidence of his guilt. With the exclusion of that evidence, the prosecution's case against Tice would be left awash in doubt." *Id.* at 40. The district court thus determined to grant habeas relief, but requested additional briefing as to its precise form.

The court's uncertainty was occasioned by an act of the Governor of Virginia, Timothy M. Kaine, who, on August 6, 2009, during the pendency of the federal habeas proceeding, granted conditional pardons to Tice and two other members of the Norfolk Four (Williams and Dick) who yet remained in prison. Tice was released from custody the next day.

On November 19, 2009, having received and considered the post-opinion briefs, the district court entered its Final Order specifying that "[t]he writ of habeas corpus will be granted if the Commonwealth of Virginia does not commence the retrial of Tice . . . within 120 days after the final resolution of any appeal (including a petition for a writ of certiorari) if an appeal is taken." *Tice v. Johnson*, No. 3:08-cv-00069, Final Order (E.D. Va. Nov. 19, 2009).[5] By timely Notice filed

---

[5]An accused whose conviction is overturned on collateral review may ordinarily be retried within a reasonable time after the judgment granting relief becomes final. *See United States v. Tateo*, 377 U.S. 463, 466 (1964); *Yaeger v. Dir., Dep't of Welfare & Insts.*, 319 F.2d 771, 772 (4th Cir. 1963). Retrial is barred, however, if a habeas court "determine[s] that the evidence introduced at trial was insufficient to sustain the verdict." *Greene v. Massey*, 437 U.S. 19, 24 (1978). No such determination was made by the district court in Tice's case.

December 18, 2009, the Director indeed took appeal to this Court, and we possess jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253.

## III.

Section 2254 of Title 28 of the United States Code authorizes the federal courts, upon application, to issue a writ of habeas corpus compelling the release of a person imprisoned pursuant to state law "on the ground that [the prisoner] is in custody in violation of the Constitution or laws . . . of the United States." 28 U.S.C. § 2254(a). Tice no longer contends that he is entitled to relief on the alternative bases set forth in his habeas application and dismissed by the district court; hence, the sole issue on appeal is whether the court correctly decided that Tice was deprived on retrial of the assistance of counsel to the minimum degree of effectiveness contemplated by the Sixth Amendment to the Constitution. *See Strickland v. Washington*, 466 U.S. 668, 686 (1984) ("[T]he Court has recognized that 'the right to counsel is the right to the effective assistance of counsel.'" (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970))).[6]

## A.

*Strickland* announced a two-prong test to analyze a Sixth Amendment claim of ineffectiveness. A defendant seeking postconviction relief must demonstrate both that counsel's performance was deficient, and that the defense was thereby prejudiced. *See* 466 U.S. at 687. Lawyers who represent criminal defendants are accorded considerable latitude with respect to proper strategy; as a result, counsel's performance

---

[6]*Strickland* thus reinforced the proposition that a criminal defendant's entitlement to *effective* legal representation is implicit in the Sixth Amendment, the bare text of which provides, in pertinent part: "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI.

will not be deemed deficient except in those relatively rare situations where, "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 690. A criminal defense attorney routinely faces thorny tactical decisions that may heavily bear on the defendant's life or liberty. Lacking complete, verifiable information, the lawyer must often make those decisions based on educated surmise and conjecture. For that reason, a court asked to engage in detached, dispassionate, after-the-fact review "must indulge a strong presumption" that counsel's decisions were within the broad spectrum of reasonableness. *Id.* at 689.

Even if the defendant manages to rebut the presumption and establish that counsel performed unreasonably, the result of the proceeding will stand "if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691 (citation omitted). The defendant must prove more than "some conceivable effect," but need not demonstrate that counsel's deficiency "more likely than not altered the outcome in the case." *Id.* at 693. Instead, it must be shown "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

1.

We review de novo the district court's decision to grant habeas relief. *See Bauberger v. Haynes*, 632 F.3d 100, 103 (4th Cir. 2011) (citation omitted). Our analysis of Tice's claim and its disposition by the Supreme Court of Virginia is tempered by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Because the asserted ground for relief centers on the application of the law to undisputed facts, and not upon the facts themselves, we may grant the writ only insofar as the state's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of,

clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).[7]

The rule and analytical framework announced by the Supreme Court in *Strickland* "unquestionably qualifies as 'clearly established' federal law under § 2254(d)." *Frazer v. South Carolina*, 430 F.3d 696, 703 (4th Cir. 2005) (citing *Williams v. Taylor*, 529 U.S. 362, 391 (2000)). Be that as it may, the Supreme Court of Virginia's application of *Strickland* is entitled to considerable deference. It is not enough for us to say that, confronted with the same facts, we would have applied the law differently; we can accord Tice a remedy only by concluding that the state court's application of the law in his case was objectively unreasonable. *See Williams v. Ozmint*, 494 F.3d 478, 483-84 (4th Cir. 2007).

At the risk of stating the painfully obvious, our perception

---

[7]Disputes of fact, by contrast, invoke the succeeding subparagraph of § 2254(d). That subparagraph proscribes a grant of the federal writ unless the adjudication by the state court "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

During the pendency of this appeal, on April 4, 2011, the Supreme Court of the United States issued its opinion in *Cullen v. Pinholster*, No. 09-1088, 563 U.S. ____ (2011). On certiorari to the Ninth Circuit, the Court proclaimed, inter alia, that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen*, slip op. at 9. The Supreme Court concluded that the court of appeals had therefore erred by considering new evidence presented to the district court in aid of the petitioner's *Strickland* claim for federal habeas relief. *See Cullen*, slip op. at 14. Confining its review to the state-court record, the Court determined that the California Supreme Court had not unreasonably applied *Strickland*, and it reversed the Ninth Circuit's judgment taking the contrary view. *Cullen*, slip op. at 31. Although Tice's claim is also one premised upon *Strickland*, and it, too, entails review under § 2254(d)(1), *Cullen* does not inform our judgment inasmuch as the district court here took no additional evidence, deciding the claim based exclusively upon the record before the Supreme Court of Virginia. In announcing our decision today, we rely upon that same record.

of how reasonably another court applies the law in a particular case is best informed by conducting our own, independent application so that we may gauge how the two compare. We shall therefore analyze, under *Strickland*'s first prong, whether counsel performed short of constitutional expectations by not moving to suppress Tice's confession. If we resolve that question in the affirmative, we shall proceed to consider whether Tice must nevertheless be denied habeas relief under *Strickland*'s second prong, in that he suffered no cognizable prejudice either because the confession would not have been suppressed or because he would have been convicted in any event.

2.

Our method of analysis diverges in one subtle respect from that employed by the other courts which have considered Tice's claim. The state habeas court and the district court each made the threshold determination that a motion to suppress would have been granted, and only then decided whether counsel's failure to so move constituted deficient performance, moving on finally to determine whether counsel's deficiency resulted in unacceptable prejudice to Tice. The Supreme Court of Virginia, which relied solely on *Strickland*'s prejudice prong to evaluate Tice's case, assumed from the outset that counsel performed deficiently, and, perhaps as part of that assumption, took for granted that the confession would have been suppressed.

Mindful of Justice O'Connor's admonition on behalf of the Court in *Strickland* that "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight," 466 U.S. at 689, we think the more prudent course is to omit from our review of counsel's performance in this case any supposed disposition of the hypothetical motion to suppress. Of course, as a general proposition, the likelihood of success appropriately bears on the decision to take a particular act in litigation. It is enough to

say for purposes of measuring counsel's performance, however, that a motion to suppress Tice's confession would have carried some substance, without opining further as to its ultimate fate until it becomes necessary to assess the prejudice, if any, stemming from counsel's inaction.

### B.

### 1.

Detective Crank's notes of his conversation with Tice were on record with the state circuit court for more than three years prior to Tice's retrial, and Mr. Broccoletti had a copy of the notes in his case file. As with any record of an accused's statements made in police custody, and especially a statement volunteered without the benefit of a lawyer's advice, the notes should have been parsed to ascertain not only the havoc the accused might have wreaked upon his defense, but also any boon he may have unwittingly bestowed. *Strickland* itself established in no uncertain terms that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." 466 U.S. at 691. Nowhere in Justice O'Connor's opinion for the Court, however, is there the slightest indication that the duty to investigate applies only to facts yet unknown, as opposed to those already in the litigation file.

A reasonable investigation of the file in this case would have revealed Detective Crank's notes of Tice's statement that "he decide[d] not to say any more." J.A. 614. On its face, such a declaration ought to give pause to even the greenest of criminal defense lawyers. Mr. Broccoletti, certainly no neophyte, candidly admitted at the state habeas hearing that "[t]he one part of the notes that do concern me is where [Crank] said, '[Tice] told me he decided not to say any more.' As I go back and look at that now, that statement may have generated something, may have generated a motion." *Id.* at 911. Mr. Broccoletti expressed his belief that "[t]here must have been

some reason I didn't file it," *id.*, but, on the witness stand, he could not conceive of one.

The Director suggests that the reason may have been that, had Tice's confession been suppressed, the Commonwealth would have sought to introduce, on rebuttal, inculpatory statements Tice made at subsequent interviews, during plea negotiations, and as a witness for the prosecution at Danser's preliminary hearing. In order to prevent the jury from considering those statements, the Director surmises, Tice would have been constrained to present no defense case at all, which, in light of the extremely favorable DNA evidence placing Omar Ballard (and only Omar Ballard) at the crime scene, amounted to a Hobson's choice for counsel. The Director speculates that Mr. Broccoletti deliberately and reasonably chose instead to take his chances with the confession, which he could (and did) argue to the jury was force-fed by the police.

One might think that such an important and irrevocable decision concerning trial tactics would have left an indelible imprint upon the memory of the strategist. But Mr. Broccoletti could not independently recall seeing Detective Crank's notes in the first place, let alone remember evaluating Tice's statement or predicating a litigation plan thereon. It seems far more probable that, as the district court suspected, "counsel simply overlooked Detective Crank's notes as a basis for suppressing Tice's confession." District Court Opinion 28.

We are therefore disinclined to accept the Director's invitation to engage in after-the-fact rationalization of a litigation strategy that almost certainly was never contemplated. Instead, we follow our own advice that "courts should not conjure up tactical decisions an attorney could have made, but plainly did not." *Griffin v. Warden, Md. Corr. Adj. Ctr.*, 970 F.2d 1355, 1358 (4th Cir. 1992). It is a difficult enough task for a reviewing court to pass judgment upon what was, without straying into a nebulous supposition of what might have

been. As Judge Martin ruminated when confronted with the Director's position:

> Ruling on a claim such as this already involves much speculation. Would the confession have been suppressed? Would the jury have convicted in the absence of the confession? To compound the speculation by deciding if the prosecution would have offered other statements, whether they would have been admissible, and what effect they might have had (and this without an opportunity for the defense to cross-examine the witnesses relating the other statements) would extend the speculative to the metaphysical.

Circuit Court Habeas Opinion 9. We entirely agree.

### 2.

Considering only those events that actually transpired, Judge Martin concluded that Tice had made a sufficient showing under *Strickland* of deficient performance. On appeal, Tice contends that we should defer to Judge Martin on that issue, because his was "the 'last reasoned' state court decision" with respect to the performance prong, Br. of Appellee 30, in that the Supreme Court of Virginia did not address that prong and therefore interposed no barrier to our review de novo. *See Hodge v. Haeberlin*, 579 F.3d 627, 649 (6th Cir. 2009) (ruling that federal habeas claim reviewed de novo where "state court did not make any factual findings or legal conclusions to which we could defer"); *Perillo v. Johnson*, 79 F.3d 441, 446 (5th Cir. 1996) (confirming that where a state habeas court leaves a factual issue unresolved, a federal court "is free to examine the issue unconstrained") (citation omitted)). Tice contends that Judge Martin's determination of counsel's deficiency "is a factual finding" entitled to a presumption of correctness pursuant to § 2254(e)(1). Br. of Appellee 28.

Subsection (e)(1) provides, in pertinent part, that in federal habeas corpus proceedings initiated by state prisoners, "a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). Contrary to Tice's contention, however, *Strickland* explicitly instructs that "both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact." 466 U.S. at 698. As such, a state court's resolution of the *Strickland* predicates are plainly outside the ambit of § 2254(e)(1)'s application to purely "factual issues," as is the ultimate issue of effectiveness. *See Strickland*, 466 U.S. at 698 ("[A] state court conclusion that counsel rendered effective assistance is not a finding of fact binding on the federal court to the extent stated by 28 U.S.C. § 2254(d) [now (e)]. Ineffectiveness is not a question of basic, primary, or historical fact." (citation, alteration, and quotation marks omitted)).

Even were we to suppose that counsel's performance presents a pure question of fact, it is by no means clear that we should consider Judge Martin's decision to be the Commonwealth's final word on the matter, notwithstanding that the Supreme Court of Virginia declined to take up the issue. In *Ylst v. Nunnemaker*, the Supreme Court of the United States held that, in order to ascertain whether a state had refused relief upon a federal habeas claim because of a state law procedural bar (which would ordinarily foreclose federal review) or because it had rejected the claim on the merits under federal law (thus permitting the federal courts to consider it), the Court would "look through" any intervening summary decisions to the "last reasoned decision" of a state court addressing the claim. 501 U.S. 797, 804 (1991).

Whether Tice's lawyers performed deficiently at trial is not a "claim," but merely constitutes a necessary component of one — the allegation that Tice did not receive the effective assistance of counsel guaranteed by the Sixth Amendment. The Supreme Court of Virginia manifestly reached the merits of that claim, denying it on the ground that Tice had not dem-

onstrated sufficient prejudice attributable to counsel's pre-
sumably deficient performance. Tice cites no instances of our
having previously applied the "look through" rule of *Ylst*
where a state procedural bar is not at issue, and we have dis-
covered none ourselves. We shall not embark on that journey
today.

### 3.

Having conducted our own independent examination of
counsel's performance with no deference to the state habeas
court, we nonetheless arrive at the same conclusion as Judge
Martin. There is simply nothing we can discern from the
record that would excuse the defense team's failure to move
to suppress Tice's confession. The error was of sufficient
magnitude that we cannot help but conclude that counsel's
performance in this singular instance was constitutionally
deficient within the meaning of *Strickland*. Our only reluc-
tance in so saying is that, based on our review of the record,
the assistance provided Tice by Messrs. Broccoletti and Rus-
sell throughout both trials and the first appeal was otherwise
laudably effective and competent. However, "'even an iso-
lated error' can support an ineffective-assistance claim if it is
'sufficiently egregious and prejudicial.'" *Harrington v. Rich-
ter*, ___ U.S. ___, 131 S. Ct. 770, 791 (2011) (quoting *Murray
v. Carrier*, 477 U.S. 478, 496 (1986) (internal citations omit-
ted)). Such is the case here.

### C.

### 1.

It is our opinion that, had the motion to suppress been
made, the trial court would have had little choice but to grant
it. The analytical framework is clear: If Tice "indicate[d] in
any manner, at any time prior to or during questioning, that
he wishe[d] to remain silent," the Norfolk police were
required to stop interrogating him. *Miranda v. Arizona*, 384

U.S. 436, 473-74 (1966). If Tice's statement that "he decide[d] not to say any more" was sufficient to cease the interrogation, his subsequent confession could not be admitted at trial unless "his 'right to cut off questioning' was 'scrupulously honored.'" *Michigan v. Mosley*, 423 U.S. 96, 104 (1975) (quoting *Miranda*, 384 U.S. at 474, 479).

Inasmuch as Detective Ford resumed questioning Tice a scant thirteen minutes after Detective Crank had finished, did not at that time issue fresh *Miranda* warnings, and continued to inquire of Tice regarding the same subject matter that prompted him to attempt to stop answering, it is plain that the Norfolk Police Department did not scrupulously honor Tice's request to break off the interrogation. *See Mosley*, 423 U.S. at 327 (explaining that right to remain silent "fully respected" where interrogation ceased upon suspect's statement that "he did not want to discuss" robbery offenses, no further questioning occurred for more than two hours, and interrogation resumed on different offense after suspect had been advised anew of his rights). Consequently, the trial court could only have denied suppression of the confession by concluding that Tice's statement (from the first-person perspective) "I have decided not to say any more" did not invoke his right to silence to begin with.

We are dubious that the trial court might have ruled in such a manner. Tice's statement was as least as definite and unambiguous as the one in *Mosley* that served to cease the questioning in that case, and as clear and unequivocal as similar invocations bearing on the same issue and cited by other courts. *See, e.g.*, *United States v. Teemer*, 260 F. Supp. 2d 187, 196 (D. Me. 2003) (suspect's statement that "I'm not gonna say anything after that, because that would violate my rights" was "clear invocation of his right to remain silent"); *United States v. Reid*, 211 F. Supp. 2d 366, 372 (D. Mass. 2002) (statement "I have nothing else to say" was "sufficiently pellucid" invocation of suspect's right to silence); *Weeks v. Commonwealth*, 450 S.E.2d 379, 385-86 (Va. 1994)

(suspect's written notation on signed form that he "d[id] not want to discuss case any further" held sufficient to invoke Fifth Amendment rights); *State v. Clemons*, 552 P.2d 1208, 1210-12 (Ariz. Ct. App. 1976) (suspect's declarations that "I am not saying nothing" and "Man, I ain't saying no more" should have ended police interrogation); *cf. Burket v. Angelone*, 208 F.3d 172, 200 (4th Cir. 2000) (suspect's musings that "I just don't think that I should say anything" and "I need somebody that I can talk to" failed to "constitute an unequivocal request to remain silent"). A reasonable police officer under the circumstances would have understood Tice's statement to mean that he no longer wished to answer questions involving the crimes against Michelle Bosko, and, therefore, that the officer should stop asking them.

In *Burket*, we considered a habeas petitioner's claim that he was unconstitutionally convicted of capital murder and sentenced to death based in part on his confession made following what he contended were valid invocations of his Fifth Amendment right to remain silent. In analyzing the claim, we observed that the rule of *Davis v. United States*, 512 U.S. 452, 459 (1994), regarding invocations of the Sixth Amendment right to counsel requires that the suspect "articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." We acknowledged then that "[w]e have not determined whether *Davis* is applicable to invocations of the right to remain silent," *Burket*, 208 F.3d at 200. That issue has now been resolved in the affirmative by the Supreme Court. *See Berghuis v. Thompkins*, 130 S. Ct. 2250, 2260 (2010) (relating that accused's prolonged non-responsiveness to investigators' questions was ambiguous or equivocal expression of his desire to cease interrogation, and therefore insufficient under *Davis* to invoke privilege against self-incrimination). We conclude that Tice's invocation in this case was clear and unambiguous enough to satisfy the strictures of *Davis*.

## 2.

### a.

The final hurdle for Tice to clear in order to demonstrate his entitlement to federal habeas relief is, by any measure, the most daunting. Tice need satisfy not merely the ordinary *Strickland* test for prejudice, namely, that a reasonable probability existed, absent evidence of his confession, that the jury would have acquitted him, but also meet the more stringent burden imposed by § 2254(d)(1): that the Supreme Court of Virginia's judgment to the contrary was itself objectively unreasonable. Mindful of the deference owed under AEDPA, we will not discern an unreasonable application of federal law unless "the state court's decision lies well outside the boundaries of permissible differences of opinion." *Goodman v. Bertrand*, 467 F.3d 1022, 1028 (7th Cir. 2006) (citations and internal quotation marks omitted).

Judge Martin scoured the trial record for any proof beyond Tice's confession that might support the jury's verdict, and he identified only Dick's testimony and the inconclusive physical evidence. Though rejecting Judge Martin's legal conclusion as to prejudice, the Supreme Court of Virginia accepted his statement of the record. The district court concurred, observing that, aside from the confession, "Dick's testimony was the only significant evidence of Tice's guilt." District Court Opinion 30.

The prejudice inquiry conducted by the Supreme Court of Virginia thus proceeded on dual paths. It strove to dispel doubts surrounding Dick's credibility while seeking to harmonize the physical and contextual evidence with the Commonwealth's theory of the case. With regard to the first path, the Supreme Court of Virginia indicated that Dick's testimony was unwavering, even on cross-examination, as to his and Tice's involvement; Dick had no motive to lie, inasmuch as he was already serving two life sentences; and there was no

evidence that Dick otherwise bore any animus toward Tice. As to the second path, the court pointed out that evidence of Williams's obsession with Michelle admitted of ready imputation to his network of acquaintances, including Tice and Dick; Michelle's fledgling friendship with Ballard supported the notion that she opened her apartment door to him on behalf of the group she had earlier rejected; and the expert testimony was consistent with the notion that Michelle could have been gang-raped with only Ballard leaving behind DNA evidence of his involvement.

With all respect to the Supreme Court of Virginia and our learned colleagues that comprise that august body, we simply cannot subscribe to its assessment of Dick's credibility. The facts and inferences that might cause one to lend credence to his sworn utterances seem rather less in number and substance than those supporting disbelief. Mr. Broccoletti pointed out to the jury via his thorough cross-examination that, as Dick's story evolved, he at first denied all involvement in the crimes, then acknowledged merely being present, and thereafter confessed to stabbing Michelle in defense of Williams. After Dick was excluded as a contributor of the DNA samples, he maintained that Williams alone killed Michelle but that Wilson was also there; after Wilson was likewise excluded, Dick implicated Tice and two then-unknown persons as additional participants. Though he denied at the preliminary hearing that a seventh man, one of African-American descent, had been present, Dick testified at Tice's retrial that, in fact, a total of eight men had been involved. The eight included Ballard, who is African-American, together with Pauley, Farris, and Danser, all three of whom were eventually cleared of wrongdoing. In between the preliminary hearing and the retrial, Dick wrote a letter insisting that Pauley and Farris had acted alone. Two days before the retrial, Dick confided to Tice's lawyers that he had not been in Michelle's apartment at all.

The Supreme Court of Virginia hardly mentioned any of the waves and troughs that made Dick's ever-changing story

so difficult to stomach, referring to them as "other inaccuracies" lumped in with Dick's inability to nail down a few factual details. The district court took issue with the state court's characterization, opining that it "only hints at how substantially Dick's testimony was impeached." District Court Opinion 30. Indeed, Judge Martin volunteered that Mr. Broccoletti's cross-examination seemed "quite damaging," Circuit Court Habeas Opinion 9, an observation that the district court termed "an understatement." District Court Opinion 37. Similarly, the Supreme Court of Virginia's observation, *see supra* Part II.B, that evidence of Danser's and Pauley's alibis were "of questionable relevance" to the defense — because the men's whereabouts "did not relate to Tice's activities on the date of the offense" — failed to address the thrust of that evidence, namely, that it tended to disprove Dick's testimony that both men were present in Michelle's apartment.

We concur with the district court that in light of "the variety of accounts Dick had provided and the lack of any significant corroboration of his testimony . . . , a reasonable jury would have grave doubts as to Dick's veracity regarding Tice's participation in the crime." District Court Opinion 41. That Dick resolutely stuck to the most recent version of his story during his relatively short stint on the witness stand offers small solace in the broader context of the interminable metamorphosis and refinement that Dick's account of the facts underwent on its long, strange trip to the jurors' ears.

We also share the district court's skepticism of Dick's supposed impartiality, in that Dick managed to foreclose the possibility of being executed by agreeing to testify against Tice and others. The district court recounted Dick's testimony on cross-examination, during which he "conceded that he had entered into a plea agreement with the prosecution wherein his charge of capital murder, with a possibility of a sentence of death, was reduced to a charge of first degree murder." District Court Opinion 33. Mr. Broccoletti attempted to elicit the details:

Q. Aren't you under obligation to testify?

A. Yes, I'm under obligation, but I also want to.

Q. And if you failed to testify, Mr. Dick, you breached or broken your plea agreement haven't you?

A. I've got no idea about that.

Q. And if you break or breach your plea agreement, could you then be facing the death penalty again?

A. I don't know.

J.A. 219-20. While the Supreme Court of Virginia's statement that Dick "was not subject to any additional penalties" for his crimes against Michelle was, probably, technically true, we do not know whether the Commonwealth would have sought rescission of Dick's plea agreement had he testified differently or not at all. Perhaps more importantly, Dick testified that he did not know, either. Given his overriding motivation to support the Commonwealth's case by living up to his end of the plea bargain, the question of whether Dick happened to harbor a personal grudge against Tice seems almost trivial by comparison, with a finding in the negative a slender reed indeed on which to posit Dick's overall truthfulness.

We do not mean to say that a juror choosing to ignore Dick's obvious flaws as a witness and credit his testimony that Tice helped to commit the awful crimes against Michelle would be unreasonable in so doing. A juror could look to the physical and contextual evidence to plausibly buy into the Commonwealth's theory that Williams, fueled by his preoccupation with Michelle, talked Tice and the others into barging their way into the Boskos' apartment by way of Ballard's subterfuge, where the situation devolved into tragedy. Eight men

could have raped Michelle, just as Dick recounted, if Ballard was the only one who ejaculated and the only one who Michelle scratched with her fingernails. Certainly, the Supreme Court of Virginia perceived Tice's case through the eyes of the foregoing hypothetical juror, *see supra* Part II.B, and not the one who just as reasonably could have thought that Dick made everything up, that Ballard gained access to Michelle's apartment for solely his own nefarious purposes, and that Ballard's was the only DNA found because he was the only one there.

b.

We are not bound in this case, however, to view the facts in the light most favorable to the prosecution. The familiar sufficiency-of-the-evidence analysis centering on whether a reasonable jury could have convicted an adequately represented defendant is considerably more deferential than the *Strickland* test for prejudice in an ineffective-assistance case, which seeks only to discover whether the absence of error would have given rise to a reasonable probability of acquittal, such that confidence in the verdict is undermined. *See Johnson v. Scott*, 68 F.3d 106, 109-10 (5th Cir. 1995) ("[T]he sufficiency of the 'untainted' evidence should not be the focus of the prejudice inquiry. The materiality standard under *Brady v. Maryland*[, 373 U.S. 83 (1963)], is identical to the prejudice standard under *Strickland*.").

In *Kyles v. Whitley*, 514 U.S. 419, 432-41 (1995), the Supreme Court addressed a *Brady* challenge to certain undisclosed evidence favorable to the accused, citing *United States v. Bagley*, 473 U.S. 667, 682 (1985), for the proposition that such evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." The Court clarified that, in *Bagley*, it adopted the same formulation for assessing materiality as it had for gauging prejudice in *Strickland*, confirming that "a showing of materiality does not

require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Kyles*, 514 U.S. at 434. The Court emphasized that the reasonable-probability analysis for materiality under *Bagley*, as for prejudice under *Strickland*, "is not a sufficiency of evidence test." *Id.*

In examining the rationale given by the Supreme Court of Virginia to support its reversal of Judge Martin's grant of habeas relief, it is apparent that the court misapprehended the *Strickland* standard in evaluating the inculpatory force of the legitimate evidence against Tice when juxtaposed with the evidence that the jury should not have considered. The relative persuasiveness of Dick's testimony vis-a-vis Tice's admission of guilt was not lost on the prosecution, which argued strenuously to the jury that "[w]hat it comes down to in this case, ladies and gentlemen, is the confession given by the Defendant." *See supra* Part I. The jury indicated through its question to Judge Poston toward the end of deliberations, *see id.*, that it was struggling to accord the proper weight to Tice's confession. It is generally a tricky business to try to divine a jury's thought processes by considering only its questions and speculating as to the reasons therefor, but it seems safe to say that the jury here did not consider Dick's testimony to be conclusive evidence of Tice's guilt.

Applying the standard properly, we cannot deny within the parameters of reason that the jury, without Tice's confession before it, would necessarily have considered the Commonwealth's remaining evidence to be so lacking as to seriously jeopardize the prospects for conviction. Had the confession been suppressed, there was a reasonable probability that the jury would have returned a different verdict, and we do not see how we could reasonably conclude otherwise.

## IV.

Defense counsel, though generally able and competent, were constitutionally deficient in the discrete, though crucial,

instance of failing to have Tice's confession suppressed. That single mistake rendered suspect the jury's verdict. The Supreme Court of Virginia's opposite conclusion constituted an unreasonable application of federal law, as clearly established by the Supreme Court of the United States in *Strickland v. Washington*. Thus, in accordance with 28 U.S.C. § 2254, Tice is entitled to the writ of habeas corpus issued by the district court, whose judgment is hereby affirmed.

*AFFIRMED*