IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. WR-29,980-03






EX PARTE MAX ALEXANDER SOFFAR, Applicant








ON APPLICATION FOR A WRIT OF HABEAS CORPUS


IN CAUSE NO. 319724 IN THE 232ND DISTRICT COURT


HARRIS COUNTY






 Cochran, J., filed a concurring statement in which Johnson and Alcala,
JJ., joined.


 I agree that applicant is not entitled to habeas corpus relief on his legal claims. 
Nonetheless, I find this case quite troubling. Judge DeMoss, on the Fifth Circuit Court of
Appeals, in addressing the record from applicant's first capital-murder trial, stated that he
had lain awake nights "agonizing over the enigmas, contradictions, and ambiguities which
are inherent in this record." (1) I feel the same way about the similar record from the second
trial conducted twenty-five years later. (2) There is something very wrong about this case, even
if applicant has not established a prejudicial constitutional violation.

 The only connection between applicant and the 1980 triple murder at the Fair Lanes
Bowling Center in Houston is applicant's custodial confession to the police. The sole
corroboration of that confession is his offhand street-corner comments to a friend vaguely
admitting involvement in the robbery-murders. Applicant's capital-murder conviction and
death sentence depend entirely upon the accuracy and reliability of his confession. But many,
if not most, of the details concerning the triple murder that applicant related in his confession
were contradicted by, or inconsistent with, the crime-scene evidence, the forensic evidence,
and the statements or testimony of the sole surviving victim. In sum, applicant's confession
does not inspire confidence in its accuracy; it appears to be a tale told by one who heard 
about the robbery-murders rather than by one who committed them.

A. The Bowling Alley Burglary and the Later Robbery-Murders.

 On the evening of July 12, 1980, three teen-age boys broke into the Fairlanes
Windfern Bowling Center on Highway 290 in Houston. They broke the glass panel of the
side door and came inside to bowl. They took only a few coins from a vending machine. 
Because the boys had damaged the side door, the bowling alley could not be securely locked
the next evening, so the manager asked two of his employees, Greg Garner and Tommy
Temple, to stay until the cleaning crew arrived at 4:00 a.m. Stephen Sims, the assistant
manager, locked the bowling alley doors at 11:30 p.m., and he stayed inside along with Greg,
Tommy, and Tommy's girlfriend, Arden Felsher. 

 Shortly thereafter, a white male entered the bowling alley, shot all four people inside,
and took approximately $1,000 from the cash register as well as the victims' wallets. All but
Greg Garner died at the scene. He survived, eventually recovered, and testified for the first
time during applicant's second trial in 2006. (3)

B. Greg Garner's 1980 Description of the Robbery-Murders.

 During the course of approximately seven interviews over three weeks, Greg Garner
was able to give police a detailed description of the robber and of how the murders had
occurred. Greg explained that he was bowling on lanes 25 and 26 while Stephen was locking
the front door. Tommy and Arden were together at the back of the bowling alley. Shortly
thereafter, Stephen unlocked the front door to let in a man carrying a white plastic jug. The
man said that he was having car trouble and wanted some water.

 The man was in his mid-twenties, approximately 5 feet, 11 inches tall, with a medium
build, and dark, curly, "weird" hair that fell over his ears but wasn't long enough to touch his
collar. Stephen walked outside with the man. When they reappeared a few minutes later, the
man was pointing a gun at Stephen. The intruder then asked Greg if he knew how to open
the cash register. Greg said, "No." The man asked Stephen if anyone else was in the alley,
and Stephen called Tommy and Arden to the front. The intruder calmly told Greg, Tommy,
and Arden to lie face-down in a semi-circle. They did so. Then he told Stephen to bring him
the money from the cash register. Stephen did so, and then he lay down on the floor with the
others. They were all in a semi-circle facing the door, starting with Arden, then Stephen,
Greg, and, finally, Tommy. The robber told his victims to hand over their wallets. They did. 
They lay quietly as the robber calmly said "goodbye" and methodically shot each one of them
in the head.

 When Greg regained consciousness, the robber was gone. Greg got up, walked over
to the control-booth counter, and called his mother, telling her, "[S]omeone is here and I need
help." Greg didn't sound normal, so Mrs. Garner roused her husband, who got dressed and
went to the bowling alley. While Greg was talking to his mother, the other bowling-alley
phone line rang. Greg put his mother on hold and picked up the other line--it was Mr.
Peters, the bowling alley manager. From the sound of Greg's voice, he, too, realized that
something was wrong, so he called the police and drove over to the bowling alley.

 Greg hung up the phone and went back to where the others were. He lay down next
to Arden because she was still alive and making breathing sounds. Thus, when the police
and his parents arrived, Greg was lying in a different spot than that when he was shot.

 As soon as they were notified of the robbery-murders, the police descended upon the
bowling alley. An officer saw the robber's white plastic water jug on the control-booth
counter near Arden's purse, but he did not realize it might have significance to the
robbery-murders, so he did not collect it as evidence. The water jug-clearly visible in a
crime-scene photograph-was tossed out by the cleaning crew that morning. The police did
not collect much forensic evidence from the bowling alley, but what little they had was
consistent with Greg's later descriptions of the robbery and murders. (4) The victims' positions
and bullet fragments that were recovered were consistent with Greg's description of where
each victim was lying when each was shot. Although latent prints were developed from the
crime scene, none of them matched prints from the victims, applicant, nor his supposed
co-defendant, Latt Bloomfield. (5) 

 The Houston media gave great attention to the triple-murder case and the police
investigation of it. Television and newspaper accounts of the crime itself, the victims, Greg's
survival, and his description of the robber-murderer featured prominently in the news for
weeks after the event. Most of the crime details were in the public domain, and the media
repeatedly broadcast the fact that a reward had been offered for information leading to the
arrest of the murderer. Although police received a number of "tips" about the crime and
several people were reported to have confessed to the robbery-murders, the police had no
strong leads and no solid suspects through the end of July.

C. Applicant's Arrest and Interrogation.

 On August 4th, Kevin Walker was riding his motorcycle home from work when he
saw applicant and his friend, Latt Bloomfield, walking down a street in Friendswood, a
Houston suburb. Kevin stopped and let applicant "try out" his motorcycle. Applicant
returned twenty minutes later on foot, saying that the motorcycle had run out of gas. Kevin
knew that wasn't true because he had just filled it up with gas. He later called the police and
reported his motorcycle stolen. 

 The next day, a patrol officer stopped applicant in nearby League City for speeding
on a motorcycle. When the officer ran the license plate, he discovered that the motorcycle
was reported stolen. He arrested applicant, who appeared to be intoxicated: his pupils were
dilated and his speech slurred; he was overly talkative and sometimes "incoherent." As the
officer waited for back-up to arrive, he had applicant empty his pockets. Applicant pulled
out a few pieces of jewelry which he said he had taken in a burglary. As applicant sat in the
back seat of the patrol car, Detective James Palmire arrived. He knew applicant well. Det.
Palmire called applicant a "punk" and reminded him of a previous threat that the detective
had made "to put him away for life" the next time applicant was arrested. Applicant told the
detective that "he wasn't going to no penitentiary over a stolen motorcycle . . . check Houston
for bigger things." On the way to the police station, applicant told the patrol officer that he
had information about the Houston bowling-alley murders. (6) Applicant asked the officer to
contact Sergeant Bruce Clawson with the Galveston County Sheriff's Department because
applicant had given Sgt. Clawson information in the past.

 Sgt. Clawson came to the police station and went with applicant to municipal court
for his magistrate's warnings. After briefly talking with applicant back at the police station,
Sgt. Clawson introduced him to Gil Schultz, a Houston homicide detective. Thereafter,
applicant gave a series of statements over the course of three days of intensive police
interrogation.

 In the first written statement, applicant said that he and Latt Bloomfield burglarized
the bowling alley one night in July. The next night Bloomfield asked him to return to the
bowling alley, so he did, but he played a relatively minor role in the robbery-murder. Latt
Bloomfield was the sole intruder; applicant just waited outside.

 In his second statement, applicant gave more details about Latt Bloomfield's role as
the robber-murderer as applicant waited outside in the car and watched the events unfolding
in the bowling alley through the front-door window. Applicant said that Bloomfield wore
a stocking over his head and that the bowling alley front door was unlocked.

 In his third statement, made after applicant learned that Latt Bloomfield had been
arrested but then released for lack of any evidence tying him to the murders, applicant said
that he and Latt had committed the robbery together and that applicant had shot two of the
victims. However, the details set out by applicant in both his second and third written
statements were largely inconsistent with the physical evidence, the forensic evidence, and
the recollections of Greg Garner.

D. The Inconsistencies Between Applicant's Written Statement and the Evidence.

 Applicant said that he pulled his T-shirt over his nose and mouth when he went into
the bowling alley and that Bloomfield wore a lady's stocking over his head. But Greg Garner
said that there was only a lone intruder who did not have any disguise. (7) 

 Applicant said that the bowling-alley door was unlocked when he and Bloomfield
went inside. But Greg Garner said that the bowling-alley door had been locked, and that
Stephen Sims had to unlock it for the stranger who said that he was having car trouble. 

 Applicant never mentioned any water jug in any of his statements. But Greg Garner
said that the intruder carried a white plastic water jug. The police found such a water jug on
the control booth counter next to Arden's purse, but, because Greg Garner had not yet told
them of its significance, they did not collect it as potential evidence.

 Applicant said that Bloomfield pulled his gun from under his shirt and pointed it at
"the man's face" as soon as the two robbers walked into the bowling alley. But Greg Garner
said that the sole intruder pulled his gun and pointed it at Stephen Sims's side only when he
came back into the bowling alley after the two men had gone outside. 

 Applicant said that Bloomfield told the people in the bowling alley, "This is a
robbery." But, according to Greg Garner, the intruder said no such thing. 

 Applicant said that Bloomfield pulled the man (presumably Stephen Sims) by his hair
and forced him to his knees. But Greg Garner said that the intruder never touched any of the
victims. 

 Applicant said that the three other victims were standing by the snack bar when he and
Bloomfield came into the bowling alley. But Greg Garner said that he was bowling on lanes
25 and 26 while Tommy Temple and Arden Felsher were in the back of the bowling alley.

 Applicant said that, as they lay on the floor, the order of the victims, starting closest
to the door, was a man, woman, man, and a man. But Greg Garner said that the order was a
woman and then three men. The ballistic evidence establishes that Greg Garner was correct
in his positioning of the victims when they were shot.

 Applicant said that the victims were lying in a straight line. Greg Garner said they
were lying in a semi-circle. 

 Applicant said that Bloomfield fired "a warning shot." Greg Garner said there was no
warning shot. (8) 

 Applicant said that Arden Felsher started to scream and Bloomfield ordered her to
"shut up." Greg Garner said that none of the victims screamed. 

 Applicant said that Bloomfield kicked Arden in the back. Greg Garner said that the
robber did not touch any of the victims. 

 Applicant said that he shot a man and a woman and that Bloomfield shot two men.
Greg Garner said that the one intruder shot all four victims.

 Applicant said that, after shooting the victims, he ran around to look in the control 
booth cash register and took money out of it, and he also took money out of the snack-bar
cash register. (9) Greg Garner said that Stephen Sims took the money out of the control booth
cash register and gave it to the intruder before the victims were shot and that the snack-bar
cash register was locked in the manager's office, so that no money was (or could have been)
taken out of it. 

 Applicant said that Bloomfield took money out of the victims' pockets after shooting
them. But Greg Garner said that the victims handed the intruder their wallets before being
shot.

 None of these individual inconsistencies, by themselves, would necessarily cast doubt
upon the accuracy of applicant's version of events, but when so many of his details do not
comport with the known evidence, something smells fishy. And because no one has ever 
given any credence to applicant's assertions that Latt Bloomfield was an accomplice to the
bowling-alley murders, the police disbelieved much of applicant's confession. 

E. Applicant's Habeas Corpus Claims.

 Both at trial and in his application for habeas corpus relief, applicant's theory is that
he is wholly innocent of the bowling-alley robbery-murders, that he falsely confessed to
committing them, and that the "real" murderer is a man named Paul Reid, who is currently
on death row in Tennessee for killing seven people in three different robbery-murders. (10) As
one of applicant's counsel explained,

 Our defense of Mr. Soffar was based on three central themes: (1) that
Paul Dennis Reid was the true perpetrator of the crime; (2) that Mr. Soffar's
confession was false because it was involuntary, incorrect, and unreliable; and
(3) that Mr. Soffar was, according to the sworn testimony of his now-deceased
mother, at home at the time of the crime. 

 Applicant includes numerous other constitutional claims in his application, (11) but they
are mainly variations on the theme of his actual-innocence claim, his "false confession"
claim, and his new claim that his three trial attorneys provided ineffective assistance. (12) 

 The most persuasive claim is that applicant's confession to the police was simply not
true: Applicant had nothing to do with the bowling-alley murders, and he concocted the story
about Latt Bloomfield being the robber-murderer-and then changed the story to involve
himself as well as Bloomfield-in a twisted attempt to avoid Detective Palmire's threat of
being sent to prison for life for the motorcycle theft that he did commit. 

 The problem with this habeas claim is that applicant fully and fairly presented it to the
jury and the jury rejected it. One of applicant's counsel explained that the trial team
challenged the voluntariness, reliability, and credibility of applicant's confession

 through cross-examining the police officers who took Mr. Soffar's various
confessions, by comparing the confessions to the facts of the crime and events
surrounding that crime, by detailing the conditions surrounding those
confessions, by eliciting Mr. Soffar's history as a police informant who
provided false information in return for benefits, and by challenging the
testimony of Ms. Cass. Our goal was to show that Mr. Soffar's statements did
not match the forensic evidence or the testimony of the sole surviving victim. 
We also sought to show that Mr. Soffar had a propensity to lie for personal
benefit, unduly trusted police officers, and had other motives to fabricate a
confession. We also sought to show that the major facts of the crime present
in Mr. Soffar's confessions had been fully aired by the police to the local news
media in the weeks prior to Mr. Soffar's arrest. (13)


 The jury in this case, as in so many cases in which the defendant "confesses,"
concluded that only a guilty person would ever confess to murder. The trial prosecutor, in
closing, argued that accepted wisdom: "Why would a person admit to shooting . . . people
and killing them during the course of a robbery if he wasn't even there?" Juries routinely
accept the notion that an innocent person would never confess to a crime he didn't commit;
therefore, if a person has confessed, he must be guilty. (14)

F. The Power of False Confessions.

 Unfortunately, that common-sense position is not necessarily accurate. Legal
literature is littered with cases in which innocent people confess to crimes that they have not
committed. The infamous Central Park Jogger case is a relatively well-known example. In
that case, five teen-aged boys were arrested and, after police interrogation, they all confessed
to being accomplices in the heinous rape of a 28-year-old Wall Street investment banker who
was left for dead in the park. (15) Even though their confessions were not consistent with the
physical evidence found at the scene and they almost immediately recanted their confessions,
juries convicted all of them of rape and robbery. (16) More than a decade later, an inmate
serving lengthy sentences for murder, robbery, and multiple rapes, came forward and
confessed to committing the Central Park Jogger rape and robbery by himself. DNA tests
showed that this man was the sole source of semen found on the victim's sock and in her
vagina. (17) The prosecution joined the defense in asking the New York courts to overturn the
teen-agers' convictions, which had been based solely upon what were shown to be
inconsistent and contradictory confessions. (18) 

 Another well-known example is the "Norfolk Four," in which four sailors were
arrested, interrogated, and confessed to the rape-murder of Michelle Bosko, a young navy
wife in Norfolk, Virginia, in 1997. (19) Three years later, Omar Ballard, an inmate who had
been convicted of attacking two other females in the vicinity during the same month, pled
guilty to being Michelle's sole rapist and murderer. DNA found at the murder scene was
consistent with his DNA. (20) Just one month earlier, a jury had convicted Derek Tice of
Michelle's rape and murder as one of the "Norfolk Four" based on his confession. (21) He, like
the other three sailors, had given a false confession after lengthy interrogation; that
confession was inconsistent with the details of the crime, and there was no physical
corroboration of its details. (22) So strong is the human urge to accept the truth of a suspect's
confession to police that Tice was convicted in a second jury trial even after Ballard had pled
guilty to being solely responsible for Michelle's rape and murder. (23) The prosecutor
repeatedly told the jury that an innocent person does not confess to murder, (24) and the jury
agreed, despite all of the physical and testimonial evidence showing that Tice was innocent
and only Ballard was guilty. (25)

 In Texas, the false confession by Christopher Ochoa to raping and murdering Nancy
DePriest and implicating his friend, Richard Danzinger, led to Ochoa pleading guilty to
murder to avoid a possible death sentence and then testifying at Danzinger's trial. Both were
sentenced to life in prison. Based upon his written custodial confession, even Ochoa's
defense attorney thought he was guilty: "There's a detailed confession, you gotta be guilty." (26)
The trial judge echoed that sentiment: "Any jury hearing [Ochoa's] testimony would have
found those two guys guilty," because Ochoa's confession and testimony "contained details
police said only a witness to the crime could have known." (27) In 1996, however, another
prison inmate confessed that he, and he alone, had raped and murdered Nancy DePriest. (28) 
DNA from the crime scene matched DNA from the prison inmate and both Ochoa and
Danzinger were excluded as DNA contributors. Ochoa and Danzinger were finally
exonerated in 2001.

 Numerous other examples of innocent people falsely confessing to serious crimes that
they did not commit are set out in Professor Richard Leo's treatise, Police Interrogation and
American Justice. (29)

G. Applicant's Claim that his Confessions Were Unreliable and False.

 Applicant makes a number of arguments in support of the claim that his three written
inculpatory statements were unreliable and thus should not have been admitted at trial or
should not be relied upon as support for his conviction. But applicant had challenged the
reliability of his written statements in his first trial, in previous habeas proceedings in state
and federal court, and in his second trial, based upon the same claim of involuntariness and
unreliability. All of his legal and constitutional claims have been rejected, and applicant
simply reasserts those same claims with additional evidence, but without a new legal basis.

 Applicant contends that he has discovered new evidence that he suffers from bipolar
disorder and has brain damage, thus he is more suggestible and he is "'higher than average
to giving into misleading information and higher than average to shifting from one response
to a different response, under pressure.'" (30) But this is not newly discovered evidence. As
the trial judge stated in her findings of fact, trial counsel were "aware that the applicant
suffered from brain damage, received a diagnosis of Attention Deficient Hyperactivity
Disorder, obtained a Full Scale I.Q. of 79 in 1990, and suffered from intellectual and
neurological deficits[.]" (31) Trial counsel had "consulted with a defense expert regarding the
applicant's mental health evidence," but made the strategic decision not to have applicant
examined by a mental-health expert and not to present expert evidence of applicant's mental
deficits at the guilt stage of trial. (32) 

 Studies support a correlation between "vulnerable" suspects-those with mental illness,
low I.Q., brain damage, low self-esteem, high levels of anxiety-and the susceptibility to
making false confessions. (33) That susceptibility or suggestiveness is heightened by sleep
deprivation, fatigue, and drug or alcohol withdrawal. (34) Applicant offered ample evidence at
trial that his confessions were involuntary and unreliable because of his suggestibility, his
"child-like" mentality, and the fact that he was intoxicated at the time of his arrest. This
claim was rejected by the trial judge in the pretrial hearing, by the jury at trial, and on direct
appeal.

 Applicant also contends that the circumstances under which he made his custodial
statements rendered them unreliable. He argues that he was threatened by an unidentified
police officer and that other officers lied to him. But considerable evidence of these
circumstances had already been presented to, but rejected by, two different trial judges, two
different juries, and both this Court and the Fifth Circuit Court of Appeals. (35) Applicant
cannot continue to relitigate the same issue in this habeas proceeding that he has already lost
in multiple prior forums. (36)

H. Applicant's Claim that His Trial Counsel Were Ineffective For Failing to Retain
an Expert Witness on False Confessions.

 Applicant argues that his trial counsel should have retained an expert in the
psychology of false confessions, and he includes a 20-page affidavit from Professor Richard
A. Leo, a highly respected expert in the area of police interrogation practice, the psychology
of police interrogation and suspect decision-making, psychological coercion, false
confessions, and wrongful convictions. Professor Leo has written numerous books and
articles on these topics and has consulted on more than 900 cases involving disputed
interrogations, qualified as an expert witness 168 times in state, federal, and military courts,
and has testified for both the prosecution and defense, as well as in civil cases. 

 Professor Leo asserts that the subjects of police investigations and false confessions 
are suitable for expert testimony because they are beyond common knowledge and are topics
about which the public has serious misconceptions. He notes that "most people are skeptical
that innocent suspects will give or agree to false confessions to serious crimes in response
to purely psychological interrogation techniques in the absence of a suspect's physical torture
or mental illness." (37) Normal people view "confessing falsely to a crime as an irrational and
self-destructive act . . . and do not believe that they themselves could be made to falsely
confess unless tortured." (38) Thus, most people assume that "virtually all confessions are true
and . . . presume that any defendant who has confessed is therefore likely guilty." Professor
Leo notes the devastating effect of confession evidence:

 [O]nce a confession is introduced into evidence against a suspect at trial, it
almost inevitably leads to a suspect's conviction. Underscoring the prejudicial
nature of confession evidence is that studies show that individuals who falsely
confessed and chose to take their cases to trial were convicted by juries 73-81% of the time before having their innocence proven. (39)


 Professor Leo's affidavit, setting out his opinions and what would have been his
testimony had he been called, discusses the psychology of police interrogation and its two-step procedure of (1) causing the suspect to view his situation as hopeless, (40) and then (2)
convincing the suspect that the only way to improve his situation is to confess to the
offense(s) of which he is accused. (41) Professor Leo then discusses how to evaluate the
reliability of an incriminating confession by evaluating the fit between the suspect's post-admission narrative (the account or story the suspect tells following the "I did it" admission)
and the crime facts or corroborating evidence derived from the confession (e.g., the location
of the missing murder weapon, loot from a robbery, the victim's missing wallet, etc.). (42) 

 The purpose of evaluating the fit between a suspect's post-admission narrative
and the underlying crime facts and derivative crime evidence is to test the
suspect's actual knowledge of the crime. If the suspect's post-admission
narrative corroborates details only the police know (i.e., have not been made
public), leads to new or previously undiscovered evidence of guilt, explains
apparent crime fact anomalies, and/or is corroborated by independent facts and
evidence, then the suspect's post-admission narrative objectively demonstrates
that he possesses the actual knowledge that would be known only by the true
perpetrator. (43)


 That verification did not happen in this case. As Professor Leo notes, applicant's
confession did not set out any "unique knowledge of non-public crime facts absent
contamination and suggestion." (44) Applicant "could not lead police to any new, missing or
derivative case information; he could not explain anomalies; and his statements were not
corroborated by physical, medical, eyewitness or other credible evidence." (45) Furthermore,
applicant's "police-written statements are contradicted by the eyewitness evidence" of Greg
Garner, and by the physical and forensic evidence. (46) Although applicant's written statements
are lengthy and highly detailed, many of the details that they contain are demonstrably
incorrect. (47)

 Professor Leo then posits that a false-confession expert could have been useful during
applicant's trial. Such an expert (and Professor Leo lists twelve of them in his affidavit)
could have provided both general and case-specific testimony about the psychology of police
interrogation and the factors that are likely to lead to a suspect making a false confession. (48) 
Professor Leo notes the limits of such testimony, but states that such an expert can educate
the jury on the counter-intuitive concept of false confessions:

 Although such an expert would not, of course, have provided an opinion about
whether Mr. Soffar's three police-written statements on August 5-7 were
ultimately true or false-that is a task solely within the jury's province-the
expert could have educated the court as to the different factors and facts that
should have been considered. In my professional opinion, the fact that Mr.
Soffar's defense counsel did not call an expert witness meant that he was not
able to effectively present to the jury a coherent analysis of the psychological
dynamics of police interrogation, how they could have led to a false
confession, or the significance of the many errors in Mr. Soffar's post-admission narratives and their lack of fit with the physical and eyewitness
evidence. (49)


 This claim has considerable allure, as does the content of Professor Leo's affidavit
and his proposed testimony. Indeed, applicant's trial counsel state that they had "considered,
but chose not to retain a testifying or consulting expert in false confessions in connection
with our trial preparation. Our decision not to gather and present such evidence was a
considered one," (50) but counsel declined to explain their strategic decision any further. The
trial court's findings of fact note that counsel consulted at least seven new experts, in
addition to those already consulted and used during the original trial and habeas proceedings,
in their preparation for applicant's retrial; these included

 psychologist J. Ray Hays who testified at guilt/innocence regarding Greg
Garner's functioning and memory; Ken Braunstein, who testified at
guilt/innocence regarding the crime scene investigation and ballistics evidence;
psychiatrist Susan Stone, M.D., who testified at punishment regarding the
applicant's background and mental health issues; pathologist Sridhar
Natarajan, M.D.; forensic consultants Ron Smith & Associates, Inc.;
psychologist Cecil Reynolds, Ph.D.; mitigation expert Gerald Byington; and
S.O. Woods, a former Texas prison system employee and criminal justice
consultant who testified at punishment regarding the applicant's prison
disciplinary record and levels of incarceration. (51)

 At some point, finite time and judicial resources dictate that not every expert on every
subject can be consulted or retained, even for a capital-murder case. (52) Certainly trial counsel
were focused on the issue of applicant's purported "false confession" and presented a wealth
of testimony and evidence to support that position. The trial judge found that

 counsel elected not to retain a testifying or consulting expert in false
confessions; that counsel's decision regarding the presentation of an expert in
false confessions was "a considered one"; that trial counsel attempted to
highlight the inconsistencies between the applicant's statements versus the
forensic evidence and Greg Garner's testimony[.] (53) 


 Further, the trial judge concluded that counsel's decision not to present an expert on
false confessions was reasonable based on then-existing case law. (54) At the time of
applicant's trial in 2006, this Court had indicated that the issue of false confessions is "not
of the kind that requires scientific or other expert testimony to assist the jury in its
determination of the relevant facts." (55) In Scott v. State, the Austin Court of Appeals
discussed at great length the admissibility of "false confession" testimony by Professor Leo
and held that the trial judge did not abuse his discretion in limiting the areas in which he
could testify. The Austin court, writing in 2005, noted that trial judge found that "the study
of false confessions has yet to produce scientifically reliable conclusions," but that even if
the expert testimony were considered reliable, it could still be excluded under Rule 403 as
insufficiently helpful to the trier of fact. (56) Thus, defense counsel cannot be held ineffective
for declining to retain or consult with an expert on "false confessions" when the trial judge
might not have admitted any such evidence in 2006, and the appellate courts of this state
would probably uphold the trial judge's discretion on a ruling either way. To conclude that
such evidence would have been admitted and that, based upon that expert evidence, there is
a reasonable possibility that the jury would have reached a different verdict (a jury that had
heard, but rejected, a great deal of evidence and argument by defense counsel that applicant's
confession was involuntary and demonstrably inaccurate) requires considerable speculation.

 I therefore agree with the trial judge's ultimate conclusion that "applicant's habeas
claims of ineffectiveness based on alternatives in strategies or the presentation of evidence
do not establish the merits of the applicant's allegations. Strickland [v. Washington, 466 U.S.
668 (1984)] at 689 (holding that there are 'countless ways to provide effective assistance in
any given case')." (57)

 In sum, although I personally do not have great confidence in the reliability or
accuracy of applicant's written statements and hence in his culpability for the triple murders,
I was not the chosen factfinder. Applicant's experienced and extremely capable counsel
presented the jury with all of the information it needed to decide that applicant made a false
confession and that he was not involved in the bowling-alley murders. The jury rejected that
factual conclusion, as it was entitled to do. I therefore must join in the Court's order denying
applicant relief on his constitutional claims.

Filed: October 3, 2012

Do Not Publish
1. Soffar v. Cockrell, 300 F.3d 588, 613 (5th Cir. 2002) (en banc) (DeMoss, J., dissenting),
rev'd, 368 F.3d 441 (5th Cir. 2004).
2. Applicant's original conviction was on direct appeal or pending on habeas review for
twenty-three years until the Fifth Circuit ordered a new trial in 2004, concluding that applicant's
trial counsel provided ineffective assistance because "the single known eyewitness was neither
contacted by defense counsel nor called to testify[.]" Soffar, 368 F.3d at 443. This failure was
prejudicial because "except for the facts recited in Soffar's confession, which could have been
controverted by that uncalled witness, there was no physical evidence, circumstantial evidence,
or other evidence that connected Soffar to the crime." Id.
3. Greg Garner did not testify during applicant's first trial nor was his absence accounted
for by the prosecution. See Soffar v. State, 742 S.W.2d 371, 373 & n.1 (Tex. Crim. App. 1987)
("Amazingly, the State presented no direct testimony or evidence at appellant's trial that would
have accounted for Garner's absence at the trial."); see also Soffar v. Dretke, 368 F.3d 441, 459
(5th Cir. 2004) (granting habeas relief and remanding for a new trial; noting that "the State did
not call Garner as a witness, but instead called Dr. Gildonburg, the neurosurgeon who operated
on Garner, during its case-in-chief. Gildonburg testified that Garner could be suffering from
retrogressed amnesia and that Garner could have created a false memory of events.").
4. Greg's original description of the event, made shortly after his brain surgery, was a
mixture of rational and irrational statements. He said that the lone assailant was a "20 foot" tall
black man who came to the bowling alley after closing time. He said that Stephen opened the
door for him and that the man, who was carrying a white plastic container, then asked for some
water. The man then went outside, but came back with a gun. He wanted money out of the
register and made everyone lie down on the floor. After he got the money, he shot them. 

 A few days later, Greg gave the police more details, but said that the intruder was a white
man, not black, around twenty-five years old, and that he had "weird" hair. Eventually, Greg
recovered enough to supervise the police drawing of the lone intruder.
5. The crime scene prints were also compared to the fingerprints of Paul Dennis Reid,
whom applicant now asserts is the real bowling-alley murderer. There were no matches. 
6. Applicant and his sister had watched a television news report several days earlier about 
the bowling-alley murders. Applicant had told his sister that the composite drawing of the
murderer that Greg Garner had helped the police create looked like his friend, Latt Bloomfield. 
He told his sister, "[T]hat would be an easy way to get a $10,000 reward would be to say that Latt
did it."
7. Greg Garner did not pick applicant out of a police lineup as the bowling-alley intruder. 
Because (1) the intruder did not wear any disguise; and (2) Greg Garner had no difficulty helping
police create composite drawings of the intruder on July 30th and August 5th, it seems peculiar
that Greg Garner could not identify applicant in a lineup on August 6th, if applicant had been the
intruder.
8. The ballistics evidence better supports Greg Garner's account of the murders than
applicant's version.
9. No physical evidence-no money, no gun, no wallets-connected to the bowling alley
robbery-murder was ever found in applicant's possession or in his apartment. And not a single
item of evidence-such as fingerprints or DNA material-was found at the bowling alley that could
be traced to applicant. Nothing but his words connect applicant to this crime.
10. A photograph of Paul Reid, taken two weeks after the bowling-alley murders, looks
very much like the composite drawing of the intruder that Greg Garner had described. 
11. As too frequently happens in capital cases, applicant has raised numerous constitutional
claims in his 254-page habeas application. Such prolixity detracts from the core issues that he
presents, muddles his main arguments, and does not serve his interests well.
12. Applicant's three trial attorneys are extremely experienced and highly regarded in the
Texas legal community. Each is a specialist in capital litigation. One of them is a past President
of the Texas Criminal Defense Lawyer's Association; one of them is a senior attorney with the
Texas Defender Service, the primary capital-litigation defense group in Texas; the lead counsel is
the Capital Trial Project Director of the Texas Defender Service. If ever a Texas capital-murder
defendant had expert, experienced, and committed representation, this applicant did. 
13. Kathryn M. Kase Affidavit ¶ 9; see also John Niland Affidavit ¶ 7.
14. See Richard A. Leo, Police Interrogation and American Justice 196-97
(Harvard University Press 2008). Professor Leo explains what he calls "the myth of
psychological interrogation" as being "that an innocent person will not falsely confess to police
unless he is physically tortured or mentally ill. The logical corollary is that suspects who confess
are guilty." Id. at 196. Professor Leo notes that a survey of potential jurors showed that 68% of
them believed that a suspect would confess falsely "not very often" or "almost never." Id. He
also notes that many police interrogators, prosecutors, and other criminal justice experts believe
this "myth" as well. Id. at 197. Professor Leo explains that


 [t]he myth of psychological interrogation persists for several reasons. Most
people do not know what occurs during interrogations because they have not
experienced it firsthand and do not know anyone who has. They are also not
familiar with how police are trained to interrogate suspects or with studies that
describe actual interrogation practices. Most people are therefore unaware of the
highly manipulative, deceptive, and stress-inducing techniques and strategies that
interrogators use to elicit confessions. Nor are they aware that these methods have
led to numerous false confessions.

 Further, most people assume that individuals do not act against their self-interest or engage in self-destructive behaviors. They therefore assume that an
innocent person would not confess to a crime he did not commit. Thus most
people cannot imagine that they themselves would falsely confess, especially to a
serious crime.


Id. at 197.
15. See People v. Wise, 752 N.Y.S.2d 837 (N.Y. Sup. 2002).
16. Id. at 840, 845-47.
17. Id. at 844.
18. See id. at 846-47.
19. See Tice v. Johnson, 647 F.3d 87 (4th Cir. 2011).
20. Id. at 89.
21. Id. at 90, 94.
22. Id. at 91, 93 ("Tice's graphic and poignant account of what occurred in Michelle's
apartment could not fail to resonate with any jury, but his recitation contains three
incontrovertible errors or omissions of fact. First, there was no evidence of forced entry into the
premises, whether from marks made by a claw hammer or otherwise. Second, although Tice said
that he ejaculated, the only DNA evidence found at the crime scene was linked to Omar Ballard;
Tice and his alleged confederates were all flatly ruled out as donors of the tested samples. Third,
Ballard undeniably raped Michelle, but one will search in vain to find Ballard's name or any
reference to him anywhere in Tice's confession.").
23. Id.
24. Id. at 94. The prosecutor argued, 

 What it comes down to in this case, ladies and gentlemen, is the confession given
by the Defendant. Ladies and gentlemen, people confess because they are guilty.
They want to get something off their chest. That's as simple as that, that's a
perfectly reasonable explanation why somebody confesses.

 * * *

 People just do not confess, particularly, to something of this magnitude, this
heinous, this vicious, without having participated in it. It's just not natural, it's
just not reasonable. People just don't do this, ladies and gentlemen.

 * * *

 [F]or somebody to confess to a crime that the defense alleged in their opening that
he didn't commit is just not reasonable.... No, ladies and gentlemen, he confessed
because he thought he did it, because he knew he had done it. That's why he told
them that he did it.... [Y]ou have no reason put before you from this trial that this
man was going to confess to this, other than the fact that he did it ... he gave his
statement.

 * * *

 [L]adies and gentlemen, if you don't believe that Omar Ballard did this by
himself, then you have to believe that the Defendant was there, and his confession
tells you that he was there. There's no other reasonable conclusion to reach in this
case, you can't disregard his confession.

Id. Never mind that the confession was demonstrably inaccurate in its details of the crime.
25. For a complete retelling of the "Norfolk Four" saga, see Richard A. Leo & Tom
Wells, The Wrong Guys: Murder, False Confessions, and the Norfolk Four (The New
Press 2008).
26. Christopher Ochoa, My Life is a Broken Puzzle, in Surviving Justice: America's
Wrongfully Convicted and Exonerated 24 (McSweeney's Publishing 2005).
27. http://www.salon.com/2000/10/31/ochoa/
28. See State v. Oakley, 227 S.W.3d 58, 59 (Tex. 2007); see also Ex parte Ochoa, No.
74246 (Tex. Crim. App. December 19, 2001) (unpublished per curiam opinion); Ex parte
Danziger, No. 74244 (Tex. Crim. App. December 19, 2001) (unpublished per curiam opinion). 
29. See Leo, supra note 14 at 237-68. 
30. Applicant's Further Amended Initial Application for Writ of Habeas Corpus, at 76
(quoting affidavit of Dr. Bruce Frumkin, a clinical and forensic psychologist).
31. Findings of Fact No. 143.
32. Id.
33. Leo, supra note 14 at 231.
34. Id.
35. See Soffar v. State, No. AP-75363, 2009 WL 3839012 (Tex. Crim. App. Jan. 27, 2009)
(not designated for publication); see also Soffar v. Cockrell, 300 F.3d 588 (5th Cir. 2002) (en
banc) (rejecting applicant's claims on federal habeas review that his written statements were
involuntary and made in violation of his Fifth Amendment rights). In her findings of fact, the
trial judge sets out an extensive list of witnesses, testimony, and documentation challenging the
voluntariness and reliability of applicant's confession in the various proceedings over the past
thirty years. 
36. See Ex parte McFarland, 163 S.W.3d 743, 748 (Tex. Crim. App. 2005) (claims that
have been raised and rejected on direct appeal normally cannot be relitigated in the context of an
application for a writ of habeas corpus); Ex parte Drake, 883 S.W.2d 213, 215 (Tex. Crim. App.
1994).
37. Richard Leo Affidavit ¶ 7.
38. Id. 
39. Id.
40. Id. ¶ 10-11.
41. Id. ¶ 12.
42. Id. ¶ 21-22.
43. Id. 
44. Id. ¶ 40.
45. Id.
46. Id. ¶ 41-42.
47. Id. ¶ 47.
48. Id. ¶ 48-49.
49. Id. ¶ 48.
50. Kathryn M. Kase Affidavit ¶ 11; John Niland Affidavit ¶ 9.
51. Findings of Fact No. 143.
52. See Ex parte Jimenez, 364 S.W.3d 866, 876-77 (Tex. Crim. App. 2012) (defendant is
entitled to expert assistance on critical trial issues if that expert can offer appreciable help, but
noting that "the State need not 'purchase for [the] indigent defendant all the assistance that his
wealthier counterparts might buy.'") (quoting Ake v. Oklahoma, 470 U.S. 68, 77 (1985)).
53. Findings of Fact No. 141.
54. Id. No. 142.
55. Basso v. State, No. 73672, 2003 WL 1702283, at *6 (Tex. Crim. App. January 15,
2003) (not designated for publication).
56. Scott v. State, 165 S.W.3d 27, 54-58 (Tex. App.-Austin 2005), rev'd on other grounds,
227 S.W.3d 670 (Tex. Crim. App. 2007) (trial judge did not abuse his discretion in limiting the
testimony of Professor Richard Leo on defendant's "false confession" issue which led to defense
decision not to call Leo at all).
57. Conclusions of Law No. 16.